**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 10-CR-614-MSK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    MARTIN JAVIER ALAMOS-GARCIA,
2.    **NOE ALAMOS-MONTES,**
3.    **DIONISIO SALGADO-MEZA,**
4.    **EFRAIN SALGADO-MEZA,**
5.    **CLARA SANCHEZ,**
    **AKA "MARIBEL SALGADO," and**
6.    **MARISELA SALGADO**,

    Defendants.

---

**UNITED STATES NOTICE OF INTENT TO USE EXPERT WITNESS
TESTIMONY PURSUANT TO FEDERAL RULES OF
CRIMINAL PROCEDURE 16(a)(1)(G)**

---

The United States of America hereby gives notice of its intent to introduce expert witness testimony pursuant to Federal Rules of Criminal Procedure 16(a)(1)(G) and the Federal Rules of Evidence 702, 703, and 705.

    **A.    Expert Relating To The Identification of the Type and Quantity of Narcotics Seized in the Case:  Roger A. Ely, Drug Enforcement Administration Senior Forensic Chemist**

The following below-designated forensic chemist may be called to testify about various chemical analyses he performed on suspected controlled substances in this case. The forensic chemist is expected to render opinion testimony about the composition of certain material relevant to this case and will give opinions as to what the primary ingredient is in the material.  The chemists performed standardized laboratory tests on and

submitted reports on chemicals which were obtained as the result of a border seizure in this case. The reports and results of the chemist's testing have already been provided to the defendants as part of discovery in this case. The Expert Qualifications of Mr. Ely is set forth in his Curriculum Vitae which is attached hereto as Exhibit A.

Mr. Ely will testify that he analyzed the substances, and that his opinions described below are based on the following chemical, physical, and instrumental analyses, the results generated by those analyses, and his interpretation of those results. In his opinion, the substance referred to as DEA Exhibit 1 has been identified as follows:

    a. Active drug ingredient: cocaine hydrochloride;

    b. Diluent: phenyltetrahydroimidazothiazole;

    c. Quantitative result: 68.0 (± 2.9%), by weight;

    d. Net weight of powder: 12.76 (± 0.004) kilograms; and

    e. Weight of cocaine hydrochloride (actual): 8.676 (± 0.375) kilograms.

The above listed opinion is based on the following physical, chemical, and instrumental analyses conducted by Mr. Ely:

    i. Color screening test - cobalt thiocyanate (2% aq.);

    ii. Infrared spectroscopy;

    iii. Capillary gas chromatography with mass selective detection (GC-MSD); and

iv. Capillary gas chromatography with flame ionization detection (GC-FID), internal standard method for quantitative analyses.

Mr. Ely's opinions are based on his education, experience and training. The bases and reasons for his opinions are included in further detail in his report, field notes, and summary of testimony attached to this notice as Exhibit B.

The Government plans on calling Roger A. Ely as a witness. However, occasionally an anticipated expert may not be available to render testimony. Should this unlikely event occur in this case, the Government reserves the right to have any and all of the drugs re-tested by another authorized forensic chemist who would be available to testify about the type and quantity of drugs involved. The Government will immediately notify the Court and the defendants should it be required to re-test material in this case and provide the name(s) of the new expert witnesses.

**B.     Expert Relating To Drug Language and Trafficking Practices: Special Agent Lori A. Butler, Drug Enforcement Administration (DEA)**

The United States hereby notifies the Court and counsel for defendants of its intent to qualify Agent Butler as an expert in the area of the general practices of the illegal drug trade and the use and meaning of code words or terms used in conversations furthering illegal drug trade in this case and to elicit testimony from the witness in the form of opinion or otherwise as permitted under Federal Rule of Evidence 701, 702, 703, 704 and/or 705.

Agent Butler may be called as an expert witness in the areas of: (1) the general practices of the illegal drug trade; (2) the meanings of certain drug related terms; (3) coded language relating to the distribution of cocaine; (4) coded language relating to the distribution of narcotics proceeds; (5) coded language relating to fear of police presence

or surveillance; (6) ambiguous or veiled language used by persons involved in drug distribution to conceal the true meaning of a conversation; (7) common units of sale of cocaine; and (8) words which indicate user quantities of narcotics verses distribution quantities of narcotics.

Agent Butler may be called upon to render opinion testimony about the meanings of terms used in intercepted wiretap and other conversations, to explain the relation of specific terms and phrases to the general practices of the drug trade.

Agent Butler has been with the DEA for more than 27 years. Special Agent Butler has spent her entire career concentrating on the prosecution of large-scale, multi-state, drug organizations. In particular, the majority of Agent Butler's cases have involved the importation of kilogram quantities of cocaine, heroin, and marijuana from Mexico into the United States and the distribution of that cocaine through multi-defendant, Hispanic drug organizations.

Agent Butler has been the lead case agent for or has assisted in more than 6 drug related wiretap investigations and has reviewed thousands of intercepted telephone calls in drug related cases. Agent Butler has also debriefed numerous cooperating defendants and confidential informants regarding code words used in telephone conversations to disguise discussion of narcotics and drug proceeds. The roles of the defendants and informants have ranged from being the source of supply to being a street level dealer. In addition, Special Agent Butler has received training in the area of narcotics investigations at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as, several DEA sponsored training courses involving narcotics investigations and methods of prosecution.

As a result of this training and experience, including on the job training such as interviews with witnesses, former defendants, informants and others, Agent Butler has developed an expertise in the coded language used by these organizations and is knowledgeable in the divisions of labor, flows of narcotics, patterns of activity, methods of communication, methods of transportation, and the economics of the drug trade.

This witness has a protocol and methodology for deciphering and analyzing terminology used by drug distribution organizations, including the organization in this case.

1.  Methodology Protocol

Agent Butler will testify by the application of extensive experience to analyze the meaning of the conversations. For purposes of illustration, the following steps or factors could be employed:

(a) When first reviewing a recorded conversation, note who the speakers are and confirm whether they have criminal histories, including arrests and convictions and whether they have been known in the past to have dealt in drugs. Also consider the speakers' employment status – particularly whether they are employed in the coded business (i.e., if the speakers are talking about construction, are they in a legitimate construction related business). Consider information about known organization affiliation and the characteristics of the organizations with which the speakers may be associated, i.e., whether a particular organization is known for dealing a certain type or form of drugs.

(b) Take into account any information about the words used in the conversation that may have been identified by or explained by confidential sources. In other words, determine whether a source has previously told me what a word or phrase means in the context of this drug investigation, or in any other drug investigation.

(c) Analyze the context of the telephone call itself, taking into account the telephone calls that may have preceded the call in question and those that came after the questioned call, and the general subject matter of the call in question.

(d) Note whether there is a commonly known code word which is being used along with any new or unfamiliar coded language. For instance, if the word "paper," a commonly used code meaning money, is used along with a word which is unfamiliar, providing a known context for the new term.

(e) Review the call, with the coded language, with other agents assigned to the investigation utilizing their prior experience to determine if any other law enforcement personnel have previous experience with the specific code terminology.

(f) Review any reports of surveillance occurring at or near the time of the call to see if anyone was followed/stopped/identified, which would assist in determining what the coded language meant. Look at whether certain evidence was seized from any individuals during a stop which might indicate what the coded language meant. Also review surveillance logs and video tapes at or near the time of the call to determine what occurred prior to and after the telephone call was made.

(g) Evaluate prior intercepted telephone calls of the same speakers to determine whether the speakers have used certain recognizable code words in the past in a same or similar situation as the questioned call.

(h) Consider whether items recovered during search/arrest warrants would indicate the meaning of these terms.

(i) Conduct interviews of defendants in investigations and specifically ask them about meanings of the various coded words and phrases, or topics, used and their meanings in the particular investigation.

With respect to the language and codes contained in conversations involved in this case, Agent Butler will testify to the general practices of the drug trade and will apply the expertise acquired from their training and experience as noted above and the protocols, principles and methodology to each telephone call intercepted in connection with this case to determine what, in the expert witness's opinion, the code words and questioned phrases mean in the context of this investigation.

    2.    <u>Legal Authority</u>

The Tenth Circuit has repeatedly upheld the admission of expert testimony concerning the general practices of the drug trade and the use of code words, jargon, and guarded speech to conduct illegal drug transactions.  In <u>United States v. Quintana</u>, 70 F.3d 1167, (10th Cir. 1995), the United States offered the testimony of a detective for the purpose of interpreting for the jury various code words and phrases used by the speakers on tape recordings from a wiretap.  The trial court allowed admission of the expert testimony, and the Tenth Circuit affirmed, citing a long line of cases which included <u>United States v. Garcia</u>, 994 F.2d 1499 (10th Cir. 1993); <u>United States v. Sturmoski</u>, 971 F.2d 452, 459 (10th Cir. 1992); <u>United States v. McDonald</u>, 933 F.2d 1519, 1522-23 (10th Cir.), <u>cert</u>. <u>denied</u>, 502 U.S. 897 (1991); <u>Specht v. Jensen</u>, 853 F.2d 805 (10th Cir. 1988), <u>cert</u>. <u>denied</u>, 488 U.S. 1008 (1989).  The Court stated, "this Court has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology." <u>Id</u>. at 1171.  The Court cited the following examples of interpretation by the detective; "ball" meaning 1/8 ounce of cocaine, "150 for 9" meaning $150 for every 9 ounces of cocaine handled by a third party on the defendant's behalf, and "8 and a half that has been stomped on" meaning 8 ½ ounces of cocaine which had been cut to reduce purity.  The Court found that such testimony "clearly fell within the parameters of Rule 702 and precedent in this Circuit." <u>Id</u>. at 1171.  <u>See</u> <u>also</u> <u>United States v. Earl</u>, 42 F.3d 1321 (10th Cir. 1994)(Expert testimony allowed to decipher seemingly innocent conversations between co-conspirators to aid the jury in determining whether the co-conspirators were using benign coded wording to converse about narcotics.).

The Advisory Committee Notes to Rule 702 (as amended and added to in 2000) state:

> [W]hen a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable." United States v. Charley, 189 F.3d 1251, 1266 (10th Cir. 1999), cert. denied, 528 U.S. 1098 (2000). Rule 702 assigns to the district court the role of gatekeeper and charges the court with assuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597; see also Fed.R.Evid. 104(a). The gatekeeper role "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.

As the Supreme Court made clear in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149(1999) "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' " (quoting Daubert at 592). In Kumho, the Supreme Court stated that the district court's duty to act as gatekeeper and to assure the reliability of proffered expert testimony before admitting it applies to all (not just scientific) expert testimony. Id. at 147.

As the Application Note to Rule 702 states, "a review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule. Daubert did not work a 'seachange over federal evidence law' and 'the trial court's role as gatekeeper' is not intended to serve as a replacement for the adversary system." Further, the Note states, "[T]his amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert."

In a case such as this one, where a Special Agent is offered as an expert to interpret coded language involved in wiretap interceptions, the Special Agent is most often challenged in the area of her interpretations of new words and phrases, terms not previously known to her and perhaps unique to the case at hand. The challenge generally calls for a showing that the new interpretations are supported by a reliable method or methods for arriving at the expert opinion of meaning. See United States v. Hermanek, 289 F.3d 1076, 1092-1097 (9th Cir. 2002). Readily admissible expert testimony, from the gatekeeping perspective, would include the expert Special Agent's interpretations of words "commonly used" in the drug trade -- words with which the officer is already familiar by virtue of her expert qualifications and experience.

9

The government's expert witness has extensive experience and knowledge of drug terminology based on many years investigating the cocaine importation and distribution business and interpreting hundreds of intercepted communications. The witness' training and experience is highly relevant, especially to conversations which are not so much about technical "code" *per se*, but which are purposefully veiled and obtuse communications about ongoing events taking place during drug distribution activities. See United States v. Dukagjini, 326 F.3d 45, 50 (2nd Cir. 2003)("As is common in drug conspiracy cases, most of the conversations on tape were disguised and ambiguous" – trial court properly permitted DEA Special Agent to testify to "words of the trade, jargon" and general practices of drug dealers.)

When a conversation involves true "code" words or phrases, training and experience are not always sufficient to establish the reliability of interpretations of new words and phrases. It is well settled that bare qualifications alone cannot always establish the admissibility of certain kinds of scientific expert testimony. See Daubert at 1315 (holding that expert testimony was inadmissible based on its unreliable methodology notwithstanding "the impressive qualifications of plaintiffs' experts"). Therefore, the government's expert witness uses the methodology described above, reviewing each intercepted call to determine first, whether code words, phrases or veiled language are being used, and, if so, to determine what the questioned language means. See United States v. Rincon, 28 F.3d 921, 924 (9th Cir.1994) (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable); Fed.R.Evid. 702 advisory committee's note (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned,

and not speculative before it can be admitted.  The . . . expert must explain how the conclusion is so grounded.").

In conclusion, the trial judge has broad discretion "to determine reliability in light of the particular facts and circumstances of the particular case." Id. at 158; see also Charley, 189 F.3d at 1266.  The trial judge enjoys broad discretion in both deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability. Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167; see also Hynes v. Energy West, Inc., 211 F.3d 1193, 1203- 05 (10th Cir.2000); United States v. Velarde,  214 F.3d 1204, 1208-09 (10th Cir 2000).

Therefore, expert interpretation from a law enforcement officer with proper credentials such as Special Agent Butler, is appropriate to explain the ambiguities and code words contained in the intercepted or recorded conversations to jurors – the jury members have likely never engaged in such vague conversations specifically to conceal the illegal nature of the circumstances being discussed.  Expert testimony can be helpful to understand the usage of seemingly common words for clandestine purposes in the drug trade as well as the use of jargon characteristic to the drug trade.  Even common words may require interpretation.  As noted by the Seventh Circuit in United States v. Ceballos, 302 F.3d 679, 685-688 (7th Cir. 2002), calling an expert law enforcement officer is proper to:

> . . . offer expert testimony on the meaning of pronouns such as "it" and "them" because the pronouns were used in an ambiguous manner and because of the agents' vast experience with drug code language. Further, this testimony was helpful to the jurors because "[a]s a result of [the agents' expert] testimony, the jury was able to apply to the evidence alternative theories of which they ordinarily would not have

> been aware." United States v. Sanchez-Galvez, 33 F.3d 829, 832 (7th Cir.1994). Finally, our conclusion regarding the admissibility of the agents' testimony is bolstered by the holding in Nersesian, whereby the court affirmed the district court's acceptance of a DEA agent's testimony that "the excessive use of pronouns" signaled a drug-related conversation. See 824 F.2d at 1307-08.

Id. The original Advisory Committee Notes to Rule 702 stated, "It will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts." Neither Daubert nor Kuhmo changed this premise.

Agent Butler will be prepared to apply both her training and experience and the above described principles and methodology to the words and phrases contained in intercepted telephone calls, or in other conversations relating to this case and which are deemed admissible by the Court.

Upon the filing of a James proffer in this case, which will more specifically identify intercepted conversations containing such words or phrases about which Agent Butler may testify in this context, the United States would request to supplement this notice in order to more fully describe her expected testimony.

Dated this 30th day of March, 2011.

        Respectfully submitted,

        JOHN F. WALSH
        United States Attorney

By:  *s/ Michele R. Korver*
      MICHELE R. KORVER
      Assistant United States Attorney
      1225 Seventeenth Street, Suite 700
      Denver, Colorado 80202
      Tel: (303) 454-0224

Fax: (303) 454-0409
**michele.korver@usdoj.gov**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 30, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to all counsel of record:

All counsel of record

  *s/ Michele R. Korver*
  MICHELE R. KORVER
  Assistant United States Attorney