IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 10-cr-614-MSK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     MARTIN JAVIER ALAMOS-GARCIA,
2.     NOE ALAMOS-MONTES,
3.     DIONISIO SALGADO-MEZA,
4.     EFRAIN SALGADO-MEZA,
5.     MARIBEL SALGADO,
      AKA "CLARA SANCHEZ," and
6.     MARISELA SALGADO,

      Defendants.

---

### GOVERNMENT'S <u>JAMES</u> SUBMISSION

---

NOW COMES THE UNITED STATES OF AMERICA, JOHN F. WALSH, United States Attorney, by Michele R. Korver, Assistant United States Attorney, and files this summary of the government's charged conspiracy case, the evidence supporting that conspiracy charge and a detailed recitation of the co-conspirator statements which the government seeks to offer at trial.

This submission does not contain a complete or total recounting of all the government's evidence, but rather is intended to satisfy the limited purpose of allowing the Court to make preliminary findings as to the initial two prongs of admissibility of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), i.e., whether a conspiracy existed and who were the members of that conspiracy. The government reserves the right to present additional evidence as to the

conspiracy and co-conspirator statements in the event that new evidence, which is not currently in the government's possession, becomes available prior to trial.  An example of such evidence might be information provided by cooperating co-defendants who have not yet entered into plea agreements with the government. A summary of the government's evidence is presented below.

## I.      AN ANALYSIS OF THE FEDERAL RULES AND GOVERNING CASE LAW

### 1.      Proving The Existence of a Conspiracy

To satisfy the requirements for admission under Rule 801(d)(2)(E), there must be "substantial evidence" that a combination or conspiracy existed.  See United States v. Bucaro, 801 F.2d 1230, 1232 (10th Cir. 1986); United States v. Andrews, 585 F.2d 961, 964 (10th Cir. 1978). "Substantial evidence" does not mean direct evidence.  The combination or common plan may be inferred from circumstantial evidence.  Bucaro, 801 F.2d 1230 at 1232; Andrews, 585 F.2d at 964 (10th Cir 1978).  In United States v. Petersen, 611 F.2d 1313, 1330 n.1 (10th Cir. 1979), the Tenth Circuit defined the required evidentiary showing as "more than a scintilla."  The court stated:

> It is such evidence as a reasonable mind would accept as adequate to support a conclusion.  *Substantial evidence is less than the weight of the evidence*.  The possibility of drawing two inconsistent conclusions from the evidence. . . does not prevent the existence of the requisite elements from being supported by substantial evidence

Id. (emphasis added); see also Bucaro, 801 F.2d at 1232.

Circumstantial evidence can be--and often is--the only form of proof of a co-conspirator's participation in a conspiracy, or of the existence of the conspiracy itself.  The courts will sustain a conviction based solely on circumstantial evidence. King v. United States, 402 F.2d 289, 292 (10th Cir. 1968).  See also United States v. Isaac-Sigala, 448 F.3d 1206, 1212 (10th Cir. 2006); Glasser v. United States, 315 U.S. 60, 80 (1942), superseded by statute on other grounds as

stated in Bourjaily v. United States, 483 U.S. 171 (1987). There need not be a formal agreement or an explicit agreement; the government need only show concerted action --- a working together of two or more persons with a common design, purpose or understanding. American Tobacco Co. v. United States, 328 U.S. 781, 809-810 (1946); United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir. 1982).

Although "mere presence" standing by itself may not be sufficient to show membership in a conspiracy beyond a reasonable doubt, presence at the scene of a crime is a factor which a jury, and the Court, may consider as circumstantial proof of membership, along with other evidence. United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir. 1988).

The government, for these purposes, is not required to prove that the conspiracy was illegal or for unlawful purposes. See United States v. Martinez, 825 F.2d 1451, 1452 (10th Cir. 1987). As the Tenth Circuit said in Bucaro, 801 F.2d at 1232 (quoting Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249 (1917)), "[i]t is not necessary. . . for the government to prove that the conspiracy was for unlawful purposes. 'The element of illegality may be shown by the [hearsay] de-clarations themselves.'" (Emphasis added.)

## 2.    Connecting a Person To The Conspiracy

Once a combination of two or more persons is established, only "slight evidence" is needed to connect a particular co-conspirator to the conspiracy. See Andrews, 585 F.2d at 964. Accord, United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990)(only "slight evidence" is need-ed); United States v. Moya-Gomez, 860 F.2d 706, 758 (7th Cir. 1988); United States v. Kennedy, 564 F.2d 1329, 1342 (9th Cir. 1977); United States v. Henderson, 446 F.2d 960, 965 (8th Cir. 1971).

As the Tenth Circuit said in United States v. Tranakos, 911 F.2d 1422, 1430 (10th

Cir. 1990), "A defendant who acts in furtherance of the object of the conspiracy may be presumed

to be a knowing participant."  See also  United States v. Delgado-Uribe, 363 F.3d 1077, 1083 (10th

Cir. 2004); Savaiano, 843 F.2d at 1294 ("[p]articipation [in a conspiracy] may be inferred from the

defendant's actions").  An alleged "minor role" is not a defense.  Id. at 1294.

### 3. A Co-Conspirator's Liability For Acts And Statements During The Conspiracy

#### a. A Conspirator Is Accountable For All 801(d)(2)(E) Statements

Once a defendant joins a conspiracy, earlier statements by his co-conspirators during

the conspiracy -- even before he joined it -- are admissible against him.  United States v. Brown, 943

F.2d 1246, 1255 (10th Cir. 1991); accord  United States v. Rocha, 916 F.2d 219, 239-40 (5th Cir.

1990); United States v. Murphy, 852 F.2d 1, 8 (1st Cir. 1988); United States v. Jackson, 757 F.2d

1486, 1490 (4th Cir. 1985).

#### b. A Defendant Is Held Accountable Even If He Did Not Know The Co-Conspirator/Declarant of The 801(d)(2)(E) Statement.

The government is not required to prove that a defendant knew the co-conspirator

who made an 801(d)(2)(E) statement.  A co-conspirator is not required to know all other members

of the conspiracy scheme.  United States v. Yehling, 456 F.3d 1236, 1240 (10th Cir. 2006)(citing

United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992); Brown, 943 F.2d at 1250;  United States

v. Miranda-Ortiz, 926 F.2d 172, 175-76 (2d Cir. 1991).  It is not necessary that all members of the

conspiracy join it at the same time, and one may become a member of a conspiracy without full

knowledge of the names, identities or locations of all of the other members.  See United States v.

4

Escalante, 637 F.2d 1197, 1200 (9th Cir. 1980); United States v. Green, 523 F.2d 229, 233 (2d Cir.

1975)(single conspiracy can be established even though it took place over a long period of time,

during which new members joined and old members dropped out); United States v. Thomas, 586

F.2d 123, 132 (9th Cir. 1978).

**c.      A Co-Conspirator Is Held Accountable Even If<br>He Did Not Know Of Or Participate In<br>All Means or Aspects of the Scheme.**

The government is not required to prove that an alleged co-conspirator agreed to,

knew of or participated in every aspect, means or detail of the conspiracy.  United States v. Smith,

413 F.3d 1253, 1276 (10th Cir. 2005); see Tranakos, 911 F.2d at 1430; United States v. Pack, 773

F.2d 261, 265-66 (10th Cir. 1985); United States v. Massa, 740 F.2d 629, 636 (8th Cir. 1984);

United States v. Read, 658 F.2d 1225, 1230 (7th Cir. 1981) (defendant "need not agree to or

participate in every step of the conspiracy"); Escalante, 637 F.2d at 1200.

As the court said in United States v. Noble, 754 F.2d 1324, 1329 (7th Cir. 1985), a

co-conspirator"[does not] have to participate in every facet of the conspiracy scheme." Cf. United

States v. Horton, 847 F.2d 313, 319 (6th Cir. 1988) (noting that "in a scheme within the mail fraud

statute, as in a conspiracy, the defendant need not be aware of or participate in all aspects of the

crime.").

**d.      A Co-Conspirator Is Accountable For<br>The Acts of His Co-Conspirators<br>Before and After the Point Where<br>He Joins the Conspiracy.**

One who joins a conspiracy takes on the same level of culpability as an originator of

the conspiracy. Lowther v. United States, 455 F.2d 657, 665 (10th Cir. 1972).  A joiner need not

know all the details of the scheme or the identities of his co-conspirators.  Small, 423 F.3d at 1182;
United States v. Sampol, 636 F.2d 621, 676 (D.C.Cir. 1980).

A joiner is held to account for all of the statements and acts done by any other
coconspirator at any time, at least up until the point where the joiner abandons the conspiracy.
United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000); United States v. Overshon, 494 F.2d
894, 896 (8th Cir. 1974).  The defendant bears the burden of showing withdrawal from a conspiracy
once it has been shown that he participated in it.  Cherry, 217 F.3d at 817-18;  See also United States
v. Fox, 902 F.2d 1508, 1516 (10th Cir. 1990).  The defendant must show that "he or she has done
'some act to disavow or defeat the purpose' of the conspiracy."  Cherry, 217 F.3d at 818; see also
United States v. Garrett, 720 F.2d 705, 714 (D.C.Cir. 1983); United States v. U.S. Gypsum Co. 438
U.S. 422, 464 (1978).  The mere arrest of one or more co-conspirators does not terminate the
conspiracy.  United States v. Thompson, 533 F.2d 1006, 1010 (6th Cir. 1976).

In a conspiracy, each member is criminally liable for all the reasonably foreseeable
crimes committed during the course of and in furtherance of the conspiracy. Pinkerton v. United
States, 328 U.S. 640 (1946); Cherry, 217 F.3d at 817.  See United States v. Galiffa, 734 F.2d 306,
315 n.10 (7th Cir. 1984)(Defendant complained unsuccessfully about being found guilty under
Pinkerton and complicity theories of possession of marijuana with intent to distribute where evidence
showed presence of defendant in vehicle used to transport marijuana, personal acquaintance with
other members of the drug distribution ring, the presence of money found after arrest of the parties,
the presence of large quantities of marijuana, and that the vehicle was rented in his name although
he was merely a passenger at the time of arrest;  Court held the evidence was "more than sufficient").

4.      **Determining Whether A Statement Is**
        **In Furtherance Of A Conspiracy**

Prior to a statement being admitted under the co-conspirator exception to the hearsay rule, there must be some evidence showing that the statements were made "in furtherance" of the conspiracy.  In determining what might constitute a statement "in furtherance" of the conspiracy, the courts have consistently held that the statement need not actually advance the conspiracy but need only promote its objectives.  United States v. Townley, 472 F.3d 1267, 1273 (10th Cir.), cert. denied 127 S.Ct. 3069 (2007); United States v. Mayes, 917 F.2d 457, 464 (10th Cir. 1990); United States v. Caro, 965 F.2d 1548, 1557 (10th Cir. 1992); United States v. Clark, 18 F.3d 1337, 1342 (6th Cir. 1994).  The court must examine the nature of the statement and the circumstances under which the statement was made.  United States v. Mayberry, 896 F.2d 1117, 1121 (8th Cir. 1990); United States v. Lewis, 759 F.2d 1316, 1340 (8th Cir. 1985).

Specifically, the Tenth Circuit in United States v. Perez, 989 F.2d 1574, 1578 (10th Cir. 1993) indicated (in citing United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991):

> When inquiring whether a statement was made 'in furtherance' of a conspiracy, we do not focus on its actual effect in advancing the goals of the conspiracy but on the declarant's intent in making the statement....No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy.  To the contrary, this determination must be made by examining the context in which the challenged statement was made.

a.      **A Statement Does Not Need To Be**
        **Between Co-Conspirators To Be**
        In Furtherance of the Conspiracy

The proffered statement may, but need not be, one made by one conspirator to another.  In United States v. Williamson, 53 F.3d 1500 (10th Cir. 1995), the Tenth Circuit stated that

the issue is whether the statements were made <u>by</u> a member of the conspiracy and not whether the statement was made <u>to</u> a member of the conspiracy.  For example, a  statement made by a co-conspirator to a government agent where the motive for making this statement was to further the conspiracy is admissible under Rule 801(d)(2)(E).  <u>Williamson</u>, 53 F.3d at 1519; <u>United States v. LeRoy</u>, 944 F.2d 787, 789 (10th Cir. 1991); <u>United States v. Harris</u>, 944 F.2d 784 (10th Cir. 1991); <u>United States v. McCarthy</u>, 961 F.2d 972, 977 (1st Cir. 1992); <u>United States v. Cox</u>, 923 F.2d 519, 526, 531 (7th Cir. 1991); <u>United States v. Lujan</u>, 936 F.2d 406, 411 (9th Cir. 1991); <u>United States v. Formanczyk</u>, 949 F.2d 526 (1st Cir. 1991); <u>United States v. Lechuga</u>, 888 F.2d 1472, 1479 (5th Cir. 1989); <u>United States v. Masse</u>, 816 F.2d 805, 811 (1st Cir. 1987); <u>United States v. Matlock</u>, 773 F.2d 227, 229 (8th Cir. 1985).

### b.  Types of Statements Which Are In Furtherance of a Conspiracy

In determining whether a statement is in furtherance of a conspiracy, a statement may be admissible even if subject to alternative interpretation if a reasonable interpretation of the statement would be consistent with an intent to promote the conspiratorial objectives.  <u>United States v. Marin</u>, 7 F.3d 679, 690 (7th Cir. 1993); <u>United States v. Tarantino</u>, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

A statement clearly may be admissible when made in response to questions.  <u>United States v. Rastelli</u>, 870 F.2d 822, 837 (2d Cir. 1989).

Similarly, a co-conspirator statement may also be admissible where it is characterized as "puffing", <u>United States v. Krevsky</u>, 741 F.2d 1090 (8th Cir. 1984), or "boasting", <u>United States v. Johnson</u>, 880 F.2d 413 (5th Cir. 1989); <u>United States v. Santiago</u>, 837 F.2d 1545 (11th Cir. 1988),

if such "puffing" or "boasting" is used to facilitate the objectives of the conspiracy.

Finally, a co-conspirator statement is admissible even in situations where the declarant is uncharged, United States v. Davis, 766 F.2d 1452, 1458 (10th Cir. 1985); United States v. McManaman, 606 F.2d 919, 926-27 (1979); see also United States v. Jones, 540 F.2d 465, 471, n.6 (10th Cir. 1976), and need not have been made in the presence of the defendant against whom it is being offered.  United States v. Cotton, 646 F.2d 430 (10th Cir. 1981).

The following is an illustrative but by no means exhaustive list of those purposes for which appellate courts have held co-conspirators statements to be "in furtherance" of the conspiracy:

1.  Statements which in any way promote the objectives of the conspiracy.  Townley, 472 F.3d at 1273; United States v. Peveto, 881 F.2d 844 (10th Cir. 1989).

2.  Statements that facilitate drug transactions.  United States v. Christian, 786 F.2d 203 (6th Cir. 1986).

3.  Statements which outline the general history of the drug conspiracy.  United States v. Stratton, 779 F.2d 820 (2nd Cir. 1985).

4.  Statements that are intended to recruit potential co-conspirators or to otherwise induce the assistance of others in carrying out the objectives of the conspiracy. Williamson, 53 F.3d at 1521; United States v. Lujan, 936 F.2d 406 (9th Cir. 1991); United States v. Jerkins, 871 F.2d 598 (6th Cir. 1989); United States v. Echeverry, 759 F.2d 1451 (9th Cir. 1985); United States v. Heinemann, 801 F.2d 86 (2nd Cir. 1986).

5.  Statements which identify a co-conspirator, the role of that co-conspirator or the source of drugs in a drug conspiracy.  Williamson, 53 F.3d 1500; United States v. Caro, 965 F.2d 1548, 1557 (10th Cir. 1992); United States v. Gomez, 810 F.2d 947 (10th Cir. 1987); United States v. Thompson, 976 F.2d 666 (11th Cir. 1992); United States v. Johnson, 925 F.2d 1115 (8th Cir. 1991); United States v. Smith, 909 F.2d 1164 (8th Cir. 1990); United States v. Magee, 821 F.2d 234 (5th Cir. 1987); Clark, 18 F.3d 1337; Cox, 923 F.2d 519; Peveto, 881 F.2d 844; United States v. Meeks, 857 F.2d 1201 (8th Cir. 1988); Mayberry, 896 F.2d 1117; Rahme, 813 F.2d 31; Herrero, 893 F.2d 1512.

6.  Statements to explain important events in the conspiracy.  Townley, 472 F.3d at 1273.

7.      Statements designed to give directions to facilitate the objectives of the conspiracy. <u>Massa</u>, 740 F.2d 629.

8.      Statements designed to advise co-conspirators of the progress of the conspiracy and keep them abreast of conspiratorial activities.  <u>Perez</u>, 989 F.2d at 1578; <u>United States v. Smith</u>, 833 F.2d 213 (10th Cir. 1987); <u>United States v. Gibbs</u>, 739 F.2d 838 (3rd Cir. 1984); <u>United States v. Simmons</u>, 923 F.2d 934 (2nd Cir. 1991); <u>Heinemann</u>, 801 F.2d 86.

9.      Statements intended to assure the listener of a conspirator's ability to consummate a particular transaction.  <u>Echeverry</u>, 759 F.2d 541.

10.     Statements intended to control damage to the conspiracy.  <u>United States v. Van Daal Wyk</u>, 840 F.2d 494 (7th Cir. 1988); <u>United States v. Doerr</u>, 886 F.2d 944 (7th Cir. 1989).

11.     Statements which prompt the listener to respond in a way that facilitates carrying out the activities of the conspiracy.  <u>United States v. Rahme</u>, 813 F.2d 31, 35 (2d Cir 1987).

12.     Statements to conceal the objective of the conspiracy.  <u>Doerr</u>, 886 F.2d at951.

13.     Statements intended to enhance a co-conspirator's usefulness to the conspiracy. <u>Tarantino</u>, 846 F.2d at 1412.

14.     Statements designed to gain the trust of co-conspirators or potential co-conspirators, to reassure trustworthiness, or to allay suspicions or fears.  <u>Smith</u>, 833 F.2d at 219; <u>Williamson</u>, 53 F.3d at 1520; <u>United States v. McLernon</u>, 746 F.2d 1098, 1105-06 (6th Cir. 1984); <u>United States v. Posner</u>, 764 F.2d 1535, 1538 (11th Cir. 1985); <u>United States v. Mealy</u>, 851 F.2d 890, 901 (7th Cir. 1988); <u>Gomez</u>, 810 F.2d at 953.

15.     Statements to new or prospective members of a conspiracy which explain the conspiracy.  <u>United States v. Monroe</u>, 866 F.2d 1357, 1363 (11th Cir. 1989); <u>United States v. Turner</u>, 871 F.2d 1574, 1581 (11th Cir. 1989).

16.     Statements which set in motion acts which are an integral part of the conspiracy. <u>United States v. Paris</u>, 827 F.2d 395, 400 (9th Cir. 1987).

17.     Statements which reveal the existence of a conspiracy.  <u>United States v. Garcia</u>, 994 F.2d 1499 (10th Cir. 1993); <u>Mayberry</u>, 896 F.2d 1117, 1122; <u>United States v. Caliendo</u>, 910 F.2d 429, 433 (7th Cir. 1990).

18.   Statements in a drug conspiracy which detail such things as price, method of payment, delivery amounts, or the like.  United States v. Robinson, 956 F.2d 1388, 1394  (7th Cir. 1992); Cox, 923 F.2d at 527.

19.   Statements which indicate payments made or demands for payment to accomplish activities of the conspiracy.  United States v. Esacove, 943 F.2d 3, 4-5 (5th Cir. 1991).

20.   Statements concerning the collection of drug debts.  This could include threats to kill any person owing money in a drug conspiracy.  Meeks, 857 F.2d at 1202-03.

21.   Statements to co-conspirators or potential co-conspirators indicating potential investigation, apprehension or punishment.  These statements could include concerns about informants, threats or physical action taken against persons who would cooperate with law enforcement authorities.  Simmons, 923 F.2d at 954; United States v. McNeese, 901 F.2d 585 (7th Cir. 1990); United States v. Triplett, 922 F.2d 1174, 1181 (5th Cir. 1991).

## 5.   The Order Of Proof

The Federal Rules of Evidence changed the long standing common law practices concerning the admission of co-conspirator statements.  The determination of the admissibility of out-of-court declarations pursuant to Federal Rules of Evidence 801(d)(2), 803, or 804(b)(3) is a question for the trial court to decide.  Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Owens, 70 F.3d 1118, 1124 (10th Cir. 1995);  United States v. Jackson, 627 F.2d 1198, 1218 (D.C.Cir. 1980).  See United States v. Lippner, 676 F.2d 456, 463-464 (11th Cir. 1982).

The admissibility of co-conspirator hearsay is governed by Federal Rule of Evidence 104(a):

Preliminary questions concerning the . . . admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).  In making its determination, [the court] is not bound by the rules of evidence except those with respect to privileges.

11

Rule 1101(d)(1) provides in similar fashion that the rules of evidence "do not apply" to "[t]he determination of questions of fact preliminary to admissibility of evidence . . ." Accordingly, the Government, in "proving up" co-conspirator statements, and the Court, in making its admissibility determinations, are not bound by the rules of evidence, except concerning privileges.

The "preferred order" of proof for the admission of out-of-court statements through application of Rule 801(d)(2)(E) permits "connecting up" strategies, proffers, pretrial hearings or any reasonable combination of approaches.

## II.    THE EVIDENCE IN THE PRESENT CASE

### A.    DURATION OF, AND MEMBERS OF THE CONSPIRACY

#### 1.    Duration of Conspiracy

The evidence in this case will show that this conspiracy began on or about May of 2002, and continued until approximately December 13, 2010.

#### 2.    Members of Conspiracy

The conspiracy to distribute narcotics involved numerous members and associates of the Dionisio Salgado Drug Trafficking Organization including but not limited to:

(A)    Dionisio Salgado

(B)    Martin Javier Alamos-Garcia aka "Javi"

(C)    Martin Javier Alamos-Delgado aka "Javier"

(D)    Noe Alamos-Montes

(E)    Israel Aguirre-Carrete

(F)    "Pilo"

(G)    Fidel Barron

(H)    "Lupe"

(I)    "Alejandro"

(J)     "Panzon"

(K)    Javier Batista-Cervantes aka "Churro"

(L)    Hector Chavez

(M)    Mauro Hernandez-Renteria

(N)    Unknown Male #3834

(O)    Calvin Wayne Skidmore aka "Uncle"

(P)    Monique Seebacher

(Q)    Emeterio Soto-Jimenez aka "Teyo"

## B. EVIDENCE SUPPORTING THE CONSPIRACY

### 1. Categories of Evidence

The evidence supporting the conspiracy will come from the following categories of sources: (1) testimonial and other evidence presented by cooperating co-defendants and cooperating unindicted coconspirators; (2) evidence derived from telephone and subscriber information, pen registers and trap and trace devices; (3) evidence derived from wiretap interceptions of telephones; (4) evidence derived from law enforcement surveillance and contacts with defendants and co-conspirators, and (5) evidence derived from search and seizure.

### 2. General Summary of the Investigation and The Conspiracy

Set forth below is the government's attempt to succinctly summarize the vast quantities of proof in this case. As stated above, this proffer is not meant to be, nor is it, a complete recounting of all the government's proof.

3.    **Background of the Investigation**

Law enforcement officers assigned to the Drug Enforcement Administration (DEA) Glenwood Springs, Colorado, Post of Duty (GSPOD) began the investigation of Defendant Dionisio Salgado in 2002.  In early 2008, the GSPOD received information from investigations conducted by DEA offices in Oklahoma City, Oklahoma, and Sierra Vista, Arizona, relating to Dionisio Salgado's participation in the importation of narcotics from Mexico into and throughout the United States.

As a result of information gleaned from those investigations, as well as the interception of Dionisio Salgado over the District of Colorado wiretap of Ernesto Quinones-Ramirez (case no. 09-WT-08-ZLW), on October 21, 2009, Senior United States District Judge Zita L. Weinshienk authorized the initial interception of Salgado's telephone, Target Telephone One (TT1) (case no. 09-WT-11-ZLW).   Based on intercepted calls over TT1, authorization was sought to continue interception of TT1 and initiate interception of Target Telephone Two (TT2), also used by Dionisio Salgado.  On December 9, 2009, United States District Senior Judge Zita L. Weinshienk signed an Order authorizing the Continued Interception of Wire Communications for TT1 and Initial Interception of Wire Communications for TT2. Further extensions were authorized on January 8, 2010, February 17, 2010, February 19, 2010, March 19, 2010, and April 19, 2010, pursuant to Orders signed by United States District Judge Christine M. Arguello.  Interception of TT1 and TT2 ceased on May 18, 2010.

As a result of interceptions over Salgado's telephones, agents also obtained authorization to intercept the telephone of Defendant Noe Alamos-Montes, Target Telephone Four, and Defendant

Martin Javier Alamos-Garcia, Target Telephone Five (TT5).[1]   On March 10, 2010, United States District Judge Christine M. Arguello signed an Order authorizing interception of Alamos-Montes' telephone (TT4); interception ceased on April 8, 2010. On March 19, 2010, and April 27, 2010, respectively, United States District Judge Christine M. Arguello signed the initial and continuation Orders authorizing interception of Alamos-Garcia's telephone (TT5), and such interception ceased on May 27, 2010.

Interceptions of these telephones, as described particularly in Exhibit A, revealed that Dionisio Salgado distributed quantities of cocaine on a local level in Avon, Edwards, and Vail, Colorado, while at the same time, he acted as a broker of kilogram quantities of cocaine from Mexico.  The evidence will show that while attempting to procure and arrange for the shipment of kilogram quantities of cocaine from several sources of supply in Mexico, Salgado maintained his local distribution business using co-defendants Martin Javier Alamos-Garcia and Noe Alamos-Montes as his local sources of supply.

     **4.**      **The Roles of Individuals in the Conspiracy**

(A)     Dionisio Salgado

The evidence at trial will show that Dionisio Salgado acted as a broker or "facilitator" between a number of sources of supply in Mexico, "Pilo" and "Lupe," and cocaine distributors located within the United States.  During the course of the conspiracy, Salgado actively sought to procure cocaine for his associate Israel Aguirre-Carrete in the Chicago, Illinois, area, and

---

[1] Agents also obtained authorization to intercept the telephone of unindicted co-conspirator "Alejandro," Target Telephone Three; however, "Alejandro" dropped his telephone before the DEA could execute the Court Order.

successfully arranged the delivery of five kilograms of cocaine to Aguirre-Carrete using his Mexican source, "Pilo."

Salgado also had a relationship with a father and son operation from Mexico, Martin Javier Alamos-Delgado and Martin Javier Alamos-Garcia, who recruited Salgado to obtain additional kilograms of cocaine from his sources to contribute to Alamos-Delgado and Alamos-Garcia's regular shipments of cocaine from Mexico through the United States to Canada.

At the same time, Salgado maintained a local cocaine distribution business in the Vail valley, using Martin Javier Alamos-Garcia and Noe Alamos-Montes as his sources of supply.

(B)     Martin Javier Alamos-Garcia aka "Javi"

The evidence at trial will show that Martin Javier Alamos-Garcia, commonly referred to as "Javi," was a direct distributor for sources of supply in Mexico. Alamos-Garcia worked in tandem with his father, Martin Javier Alamos-Delgado, who was located in Mexico. Alamos-Garcia, who has U.S. citizenship, acted as his father's representative and partner in the United States, distributing cocaine to other distribution level customers in Colorado, as well as organizing and supervising shipments of cocaine through the U.S. to Canada.

(C)     Martin Javier Alamos-Delgado aka "Javier"

The evidence at trial will show that Martin Javier Alamos-Delgado, commonly referred to as "Javier," was the Mexico-based point of contact for his son Martin Javier Alamos-Garcia. Alamos-Delgado arranged the procurement of cocaine from Mexican sources of supply for importation and distribution in the U.S. and Canada. Alamos-Delgado's primary source of supply in Mexico was "Panzon."

(D)     Noe Alamos-Montes

The evidence at trial will show that Noe Alamos-Montes, a cousin of Martin Javier Alamos-Garcia, operated a local cocaine distribution business in Colorado.  At times, Alamos-Garcia was Alamos-Montes' source of supply.  After police contact with one of Salgado's customers, Alamos-Garcia fearfully left Colorado for Mexico, leaving Alamos-Montes in charge of his Colorado drug clients, including Dionisio Salgado.

(E)     Israel Aguirre-Carrete

The evidence at trial will show that Israel Aguirre-Carrete is a kilogram level cocaine distributor in the Chicago, Illinois, area, who is an associate of Dionisio Salgado.  Interceptions reveal that Salgado regularly worked with his contacts to secure cocaine for Aguirre-Carrete, and although Salgado arranged delivery of cocaine for Aguirre-Carrete, they communicated as partners or peers.  On or about March 12, 2010, Aguirre-Carrete received five kilograms of cocaine in Illinois from Mexican source "Pilo."  The delivery was arranged by Salgado, and Salgado received payment from Aguirre-Carrete for his role in the transaction.

(F)     "Pilo"

The evidence at trial will show that "Pilo" is a kilogram quantity source of supply located in Mexico.  "Pilo" used couriers located in Oklahoma to distribute cocaine imported from Mexico into the United States. Salgado had regular contact with "Pilo" and attempted to get "Pilo" to contribute cocaine to the shipments being run to Canada by Alamos-Delgado and Alamos-Garcia.  "Pilo" was the source of the five kilograms of cocaine delivered to Israel Aguirre-Carrete.

(G)     Fidel Barron

The evidence at trial will show that Fidel Barron is an associate of "Pilo."  Barron coordinated payments to "Pilo" from Salgado for cocaine delivered to Israel Aguirre-Carrete.

(H)     "Lupe"

The evidence at trial will show that "Lupe" is a kilogram quantity source of supply located in Mexico. Salgado had regular contact with "Lupe" and also attempted to get "Lupe" to contribute cocaine to the shipments being run to Canada by Alamos-Delgado and Alamos-Garcia.  During intercepted conversations, Salgado consulted "Lupe" about possible sources of cocaine for Aguirre-Carrete.  "Lupe" referred Salgado to an associate located in the United States, "Alejandro," as a possible alternate source of supply.

(I)     "Alejandro"

The evidence at trial will show that "Alejandro" is a direct distributor for sources of supply in Mexico.  "Alejandro" served as a "U.S. representative" for an associate of "Lupe" in Mexico. "Lupe" introduced "Alejandro" to Salgado as an alternative source of supply.  Salgado attempted to broker kilograms of cocaine for Aguirre-Carrete from "Alejandro." Salgado also attempted to recruit "Alejandro" as an additional source of supply to the shipments being run to Canada by Alamos-Delgado and Alamos-Garcia.

(J)     "Panzon"

The evidence at trial will show that "Panzon" is the primary Mexican source of supply to Alamos-Delgado and Alamos-Garcia.  "Panzon" supplied several loads of cocaine from Mexico to Canada, including the 16.5 kilograms of cocaine seized at the Canadian border on April 30, 2010.

(K)     Javier Batista-Cervantes aka "Churro"

The evidence at trial will show that Javier Batista-Cervantes, commonly referred to as "Churro," is a kilogram quantity cocaine distributor located in Canada.  Batista-Cervantes,  Hector Chavez, and Mauro Hernandez-Renteria coordinated and received shipments of cocaine from Alamos-Delgado and Alamos-Montes using Canadian courier Calvin Wayne Skidmore and others.

(L)     Hector Chavez

The evidence at trial will show that Hector Chavez, along with Batista-Cevantes and Hernandez-Renteria, is a kilogram quantity cocaine distributor located in Canada..  Hector Chavez, Batista-Cervantes and Hernandez-Renteria coordinated and received shipments of cocaine from Alamos-Delgado and Alamos-Montes using Canadian courier Calvin Wayne Skidmore and others.

(M)     Mauro Hernandez-Renteria

The evidence at trial will show that Hernandez-Renteria, along with Batista-Cevantes and Chavez was (he is deceased) a kilogram quantity cocaine distributor located in Canada..  Hernandez-Renteria, Chavez, and Batista-Cervantes coordinated and received shipments of cocaine from Alamos-Delgado and Alamos-Montes using Canadian courier Calvin Wayne Skidmore and others

(N)     Unknown Male #3834

The evidence at trial will show that UM3834 is a drug and money courier based out of Oklahoma that transports drug loads for Mexican supplier "Pilo."  UM3834 and his associates transported the five kilograms delivered to Aguirre-Carrete in Illinois in March, 2010.

(O)     Calvin Wayne Skidmore aka "Uncle"

The evidence at trial will show that Calvin Wayne Skidmore, commonly referred to as "Uncle" or "the old man," was a Canadian drug and money courier who worked for Hernandez-Renteria, Chavez, and Batista-Cervantes transporting cocaine and money between Canada and Mexico.  On April 30, 2010, Skidmore was arrested in Montana at the U.S./Canadian border transporting 16.5 kilograms of cocaine received from Alamos-Delgado and Alamos-Garcia in Mexico.

(P)     Monique Seebacher

The evidence at trial will show that Monique Seebacher was a regular cocaine customer of Dionisio Salgado and small quantity re-distributor in the Vail valley.

(Q)     Emeterio Soto-Jimenez aka "Teyo"

The evidence at trial will show that Emeterio Soto-Jimenez is a cocaine distributor in the Vail valley area.  Soto-Jimenez received his supply of cocaine from Salgado.

**5.     Summary of Drug Trafficking Activity in Furtherance of the Conspiracy**

**Dionisio Salgado's local distribution activities**

Beginning in October 2009, interceptions over Salgado's telephone (TT1) revealed that Salgado was distributing to local customers in the Vail Valley area on a regular basis.  Several regular customers were identified through the interceptions, including female cocaine customer Monique Seebacher and  male cocaine customer Emeterio Soto-Jimenez.

On or about December 10, 2009, calls were intercepted between Salgado and Soto-Jimenez during which Soto-Jimenez requested drugs from Salgado, using the term, "workers," to mean cocaine.  Salgado told Soto that he could come over for a sample.  Afterward, Salgado called

20

Alamos-Garcia to find out the availability of cocaine. Alamos-Garcia confirmed that he had some and that more would be arriving. On December 15, 2009, calls intercepted revealed that Salgado and Alamos-Garcia made arrangements to meet for the purpose of Alamos-Garcia delivering the cocaine Salgado needed for Soto-Jimenez. Alamos-Garcia told Salgado that Noe Alamos-Montes would be bringing him. Based on the phone calls, Alamos-Garcia met with Salgado to deliver the cocaine. That same date, during several calls between Salgado and Soto-Jimenez, the men agreed to meet at Salgado's job, located at the Riverwalk shopping complex in Edwards, Colorado. In anticipation of the meeting, agents set up surveillance of the location and observed Soto-Jimenez arrive at the complex and go inside as instructed by Salgado. After leaving the complex and driving away with a female passenger, a marked Eagle County Sheriff's Office unit conducted a traffic stop of Soto-Jimenez in his vehicle. The officer conducted a consent search of the vehicle and Soto-Jimenez with the help of a K-9 unit. No drugs were found, and Soto was released.

Later that day, a series of intercepted calls between Salgado and Soto-Jimenez revealed that Soto-Jimenez was very nervous about the stop, refusing to talk about the incident on the phone and asking Salgado to meet him to talk about it. Salgado expressed concern during the calls about whether or not it was safe to meet with Soto-Jimenez.

The next day, on December 16, 2009, Salgado called one of his sources of supply in Mexico, "Pilo," and related how "they," the police, "scared the crap out of him," referring to Soto-Jimenez. Salgado stated that it was a miracle "they didn't f___ us up."

On December 21, 2009, Noe Alamos-Montes called Salgado and indicated that Salgado should pay Alamos-Montes for the "last thing," referring to the cocaine supplied to Salgado by Alamos-Garcia, because Alamos-Garcia had gone to Mexico and probably wasn't coming back.

Alamos-Montes also stated that the last delivery of drugs from Alamos-Garcia actually came from Alamos-Montes' source.  Salgado replied that he wanted to talk to Alamos-Garcia first.

That same date, Salgado called Alamos-Garcia.  During the intercepted call Alamos-Garcia expressed concern there were problems and told Salgado more than once to be careful.  Alamos-Garcia stated that Salgado could pay Alamos-Montes and that "I left Noe in charge there."  Alamos-Garcia indicated that he did not know when he would be back and that there was still cocaine left with Alamos-Montes.

Over the next week, calls were intercepted between Salgado and Alamos-Montes during which Alamos-Montes attempted to collect drug money owed from Salgado.  On December 29, 2009, surveillance agents observed Alamos-Montes arrive at Salgado's place of business in Avon, Colorado, as agreed to receive the money from Salgado.

Numerous calls between Salgado and Monique Seebacher were intercepted in which the two make arrangements for Seebacher to buy cocaine from Salgado.  For example, on December 28 and 29, 2009, calls were intercepted between Salgado and Monique Seebacher during which Seebacher ordered drugs from Salgado, and they made arrangements for their delivery at Seebacher's residence.  On December 29, 2009, surveillance agents observed Salgado arrive at Seebacher's residence to deliver the drugs as arranged.

### Dionisio Salgado attempts to obtain kilogram quantities of cocaine through "Alejandro," associate of Mexican source "Lupe"

In January 2010, Mexican source of supply "Lupe" provided Salgado with a contact number for "Alejandro," a narcotics distributor located in the United States.  On January 13, 2010, Salgado met with  "Alejandro" in Avon, Colorado, to discuss doing business together.  DEA surveillance

captured the meeting. Afterwards, Salgado reported the outcome of the meeting to associates Aguirre-Carrete and "Lupe." Salgado identified "Alejandro" as a significant transporter of narcotics. Throughout the conspiracy, Salgado continued to negotiate possible cocaine shipments from "Alejandro" to Salgado's contacts, including Aguirre-Carrete. Salgado also attempted to recruit "Alejandro" as an additional source of supply to the shipments being run to Canada by Alamos-Delgado and Alamos-Garcia.

### Dionisio Salgado procures five kilograms of cocaine for Israel Aguirre-Carrete in Chicago, Illinois, from Mexican source "Pilo"

Beginning in March of 2010, numerous calls were intercepted between Salgado, Aguirre-Carrete, "Pilo," and Pilo's associate – UM 3834. In these conversations, acting as a broker for Aguirre-Carrete, Salgado discussed and arranged the shipment of five (5) kilograms of cocaine from "Pilo" in Mexico to Aguirre-Carrete in the Chicago, Illinois, area. The cocaine was transported by the niece and nephew of Pilo's associate, UM3834, in Oklahoma. During the course of these discussions, and prior to the delivery of the 5 kilograms of cocaine, Aguirre-Carrete was visited in Illinois by another cocaine source, known as "the Engineer," who Salgado had arranged through his other source of supply in Mexico, "Lupe." An agreement to price per kilogram of cocaine could not be reached between Aguirre-Carrete, Salgado, and the Engineer. However, on or about March 12, 2010, the couriers transporting Pilo's five kilograms of cocaine arrived at Aguirre-Carrete's location in Illinois. DEA surveillance in Illinois captured the delivery. The cocaine was concealed in a vehicle transported from Mexico, through Oklahoma, to Israel in Illinois. Many of the conversations between Salgado, Aguirre-Carrete involve the status of the couriers' arrival in Illinois. The couriers encountered problems traveling causing a delay of the delivery. A few days following the delivery,

Aguirre-Carrete gave the couriers money to transport back to Pilo in Mexico as payment for the delivered cocaine.

### Martin Javier Alamos-Garcia and his father Martin Javier Alamos-Delgado recruit Dionisio Salgado to obtain additional kilograms of cocaine for their shipments to Canada

During the months of February, March, April, and May 2010, Salgado, Alamos-Delgado, Alamos-Garcia, "Pilo," LNU, Javier Batista-Cervantes, "Alejandro," Hector Chavez, and "Panzon" discussed the transportation of multi kilogram quantities of cocaine from Mexico, through the United States, for delivery in Canada.  During these discussions, Alamos-Delgado and Alamos-Garcia enlisted the help of Salgado to communicate with his cocaine sources of supply in Mexico to participate in the shipments to Canada, because Alamos-Delgado and Alamos-Garcia could not get the quantities from their source of supply in Mexico that the Canadians were requesting.  Salgado agreed to try and obtain more cocaine for the shipments, and had discussions with sources of supply "Pilo," "Lupe," and "Alejandro," to this effect.

### Martin Javier Alamos-Garcia and Martin Javier Alamos-Delgado import approximately 16.5 kilograms of cocaine into the United States for delivery to Javier Batista-Cervantes, Mauro Hernandez-Renteria and Hector Chavez in Canada; cocaine is seized in Montana at the Canadian border by ICE from the vehicle of courier Calvin Wayne Skidmore

According to Immigration and Customs Enforcement (ICE) records, on March 24, 2010, Calvin Wayne Skidmore entered the United States at the Del Bonita, Montana port of entry in a vehicle.  On that same date, Martin Javier Alamos-Garcia entered the United States at the El Paso, Texas port of entry on foot.  On March 25, 2010, a series of calls were intercepted between Alamos-Garcia, who was at the time located in Denver, Colorado, and co-conspirators located in Canada, Javier Batista-Cervantes (aka "Churro") and Mauro Hernandez Renteria.  Batista-Cervantes and

24

Hernandez-Renteria were reporting their courier's, Calvin Wayne Skidmore, itinerary and location as Skidmore traveled with money from Canada to meet Alamos-Garcia in Colorado. (Item nos. 106-107) .

On April 26, 2010, at approximately 9:35 p.m., ICE advised that Alamos-Garcia and Skidmore arrived at the U.S./Mexico border at Santa Teresa, New Mexico, driving a pickup bearing an Alberta, Canada tag# ZRK-454 registered to Skidmore, the same vehicle Skidmore had used to enter the U.S. from Canada on March 24, 2010. ICE searched the vehicle with negative results. Alamos-Garcia and Skidmore were allowed entry into the United States.

On April 30, 2010, at approximately 11:38 a.m., Skidmore arrived at the Del Bonita, Montana, Port of Entry and was questioned by U.S. Port Inspectors. Skidmore informed the Inspectors that he had been working in Amarillo, Texas, without a work permit. Skidmore was advised that he would be detained pending further investigation into his immigration status and work in the United States. During the initial investigation, a narcotics K-9 alerted to Skidmore's vehicle. Skidmore and his vehicle were then transported to the Port of Entry at Sweetgrass, Montana. At approximately 5:58 p.m., during the search of Skidmore's vehicle, approximately 16.5 kilograms of cocaine were found concealed in a hidden compartment located in the dash of the vehicle. Skidmore had been followed by law enforcement agents to the Montana border based on interceptions over Alamos-Garcia's phone.

From April 28, 2010, through May 6, 2010, calls were intercepted between Martin Javier Alamos-Garcia, Martin Javier Alamos-Delgado, Javier Batista-Cervantes, Hector Chavez, and "Panzon"--- the Mexican source of supply for the cocaine seized on the border from Skidmore's vehicle. During the calls, the men tracked Skidmore's progress through the United States to Canada

with the cocaine hidden in his vehicle.  Initially, Skidmore's trip was delayed due to inclement weather, but once Skidmore was detained at the border and ceased communication with his Canadian counterparts, Batista-Cervantes, Hernandez-Renteria, and Chavez, all of the participants in the conversations began to worry and opine on what happened to Skidmore.  Once Skidmore's fate was confirmed, the men discussed their concern about getting caught.

On May 13, 2010, a call was intercepted between Salgado and Alamos-Garcia during which Alamos-Garcia asked Salgado about the status of his sources who could contribute cocaine to the Canada shipments.  Alamos-Garcia bragged about the great opportunity "over there," stating to Salgado, "let's see if your friends are willing."  Salgado replied "now we can do something."  This phone call establishes that despite the seizure a few weeks earlier, Alamos-Garcia intended to continue importing cocaine to Canada, and Salgado intended to continue attempting to procure cocaine for these shipments from his sources of supply.

All of the above evidence, as further detailed in Exhibit A, establishes that the above listed defendants and unindicted individuals conspired with each other and others to distribute and possess with the intent to distribute cocaine.

III.    **GOVERNMENT'S LIST OF STATEMENTS AND CONVERSATIONS ADMISSIBLE UNDER THE CO-CONSPIRATOR HEARSAY EXCEPTION**

Attached as Exhibit A to this proffer is a chart containing a description, and brief summary of the conversations the government currently intends to offer at trial which the government believes satisfy the requirements for admissibility under Rule 801(d)(2)(E), the co-conspirator exception to the hearsay rule.

Lastly, as set forth above, the government reserves the right to present additional evidence as to the conspiracy and co-conspirator statements in the event that new evidence, which is not currently in the government's possession, becomes available prior to trial.

Respectfully submitted this 10th day of June, 2011.


JOHN F. WALSH
UNITED STATES ATTORNEY
DISTRICT OF COLORADO

By: *s/Michele R. Korver*
MICHELE R. KORVER
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, Colorado  80202
Phone:  (303) 454-0100
Fax: (303) 454-0401
michele.korver@usdoj.gov


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 10, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following individuals:

All counsel of record


*s/ Michele R. Korver*
MICHELE R. KORVER
Assistant United States Attorney